File Name: 06a0172n.06
Filed: March 6, 2006

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| TERRY E. ADKINS and | ) | COURT FOR THE EASTERN |
| JANE M. ADKINS, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |

Before:        **NELSON** and **GILMAN**, Circuit Judges, and **DONALD**, District Judge.[*]

**DAVID A. NELSON**, Circuit Judge.  Terry E. Adkins and Jane M. Adkins, husband and wife, were found guilty of conspiring to receive child pornography, receiving it, and possessing a computer on which it was stored.  The district court sentenced Mr. Adkins to imprisonment for 900 months and Mrs. Adkins to imprisonment for 365 months.  The defendants now appeal their convictions and sentences.

Mr. Adkins challenges the district court's refusal to suppress evidence consisting of materials seized pursuant to a search warrant and statements made by Adkins to the police at the time of the search.  He further contends that the district court erred by enhancing his

[*]The Honorable Bernice Bouie Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

guideline sentence range, by departing upward from the enhanced range, and by treating the guidelines as mandatory. Mrs. Adkins' contentions are similar to her husband's in many respects, but she proceeds from somewhat different factual premises.

We are not persuaded that the district court erred in denying the defendants' motions to suppress. Nor do we think the court misapplied the sentencing guidelines. We are persuaded, however, that re-sentencing is appropriate under *United States v. Booker*, 125 S. Ct. 738 (2005). Accordingly, we shall affirm the defendants' convictions, vacate their sentences, and remand both cases for re-sentencing.

I

In July of 2003 Special Agent Frank Vito of the Federal Bureau of Investigation applied for warrants to search the house, car, and "physical characteristics" of Terry Edward Adkins. The stated purpose was to seek evidence that Mr. Adkins possessed child pornography that had been transported in interstate commerce or evidence that Adkins had traveled in interstate commerce for the purpose of engaging in a sexual act with a person under the age of 18.

Agent Vito submitted an affidavit in support of the application. The affidavit began by describing four recent incidents in which young children had been sexually molested. Agent Vito then explained that an informant, after seeing a composite sketch of the perpetrator on television, told police that Mr. Adkins might have been involved. The

informant provided additional information about Mr. Adkins that tended to implicate him in the series of child molestations.

The informant, Agent Vito explained, said that Mr. Adkins kept stuffed animals and other toys in his car, although neither he nor his wife had any children. The informant also mentioned that Mr. Adkins owned "a very modern computer," at which he spent "a great deal of time." Police subpoenaed records from Adkins' internet service provider and learned that Adkins (or someone using his screen names) had spent hundreds of hours on the internet between May 6, 2003, and July 30, 2003. The investigation also revealed that Adkins had visited an internet site for persons with a sexual interest in wearing diapers.

The informant said further that in 1999 Mrs. Adkins told the informant about incidents in which she and Mr. Adkins had sexually molested children for whom Mrs. Adkins was a babysitter. During the same time frame, the informant said, Mrs. Adkins confided that she and her husband had discussed a plan to kidnap a child for sexual purposes.

In the next portion of the affidavit Agent Vito outlined information he had received from other sources; this information included Mr. Adkins' history as a victim of sexual abuse and as a sexually aggressive child.

Next, Agent Vito said that he had consulted with Supervisory Special Agent James Clemente of the FBI, an expert on crimes against children. Using information provided by Agent Clemente, Agent Vito explained that some child sex offenders are categorized as "preferential offenders." Preferential offenders are sexually attracted to children, and "[t]heir

sexual behavior with children . . . is typically repetitive and predatory." "In order to satisfy their desires," Agent Vito said, "these offenders devote substantial amounts of time, money and/or energy to pursuing child pornography and/or sexual contact with children."

Agent Vito described some of the habits and activities of typical preferential offenders, such as collecting child pornography, collecting non-sexual items relating to children, photographing children, "having overly idealized opinions about children," and "investing exorbitant amounts of time with children or children's activities." The agent also referred to a study tending to show that a high percentage of persons who collect child pornography have a history of sexually molesting children.

Agent Vito then expressed an opinion that Mr. Adkins "has exhibited the typical behavioral characteristics of a Preferential Child Sex Offender" and that Adkins "is in fact[] a preferential sex offender." The agent concluded from this that Adkins probably had a collection of child pornography. The agent believed it likely that some of this collection would be stored on Adkins' computer.

A judge issued the requested search warrants, which were executed at about 10:00 p.m. on July 30, 2003. Approximately 3,000 photographs of children engaged in sexual activity were found on Mr. Adkins' computer. Mr. Adkins admitted to police that he had downloaded child pornography.

Two officers interviewed Mrs. Adkins while the search warrants were being executed. The interview began at a restaurant and continued at a sheriff's office after the restaurant

closed.  Mrs. Adkins later testified that she did not think she was free to terminate the interview.  She said that the officers would not let her enter her house to change out of her pajamas, that they would not tell her "what was going on," that they did not say she was free to leave, and that she had no vehicle in which to leave in any event.  According to one of the officers, on the other hand, Mrs. Adkins was told that she was not under arrest, that she did not have to talk to the police, and that the officers would take her home any time she wished.  The officer testified that Mrs. Adkins was wearing trousers and a shirt and that another officer retrieved a pair of shoes from the house for her.  It is undisputed that Mrs. Adkins never asked to be taken home.

Mrs. Adkins admitted to the officers that she and her husband used their computer to download child pornography from the internet.  She also inculpated Mr. Adkins in at least two of the incidents of child molestation described in Agent Vito's affidavit and said that both she and Mr. Adkins had molested children on several other occasions.  At the conclusion of the interview, Mrs. Adkins signed a waiver of her *Miranda* rights and gave four written statements.  She later testified, however, that her statements concerning child molestations were not true.  Because the officers would not accept that she knew nothing about the incidents, she said, she "finally gave in and told them what they wanted [her] to say."  Mrs. Adkins has not denied the truthfulness of her statements with respect to child pornography.

Mr. and Mrs. Adkins were each indicted on one count of conspiring to receive child pornography that had been transported in interstate commerce, 99 counts of receiving such material, and one count of possessing a computer on which such material was stored.

Mr. Adkins moved to suppress the evidence seized pursuant to the search warrant and the statements he made at the time of the search. The thrust of Adkins' argument was that Agent Vito's affidavit did not establish probable cause to believe that evidence of child pornography crimes would be found at Adkins' residence. His statements, Adkins argued, should be suppressed as fruits of the illegal search.

Mrs. Adkins moved to suppress all of her statements to the police. She pointed out that she was not given her *Miranda* warnings until the end of her interview, and she argued that her statements were not voluntary.

The district court denied both motions to suppress, except for the portion of Mr. Adkins' motion that dealt with the search of his physical characteristics. (It does not appear that the latter search revealed any inculpatory evidence.) Mr. Adkins moved for reconsideration, but that motion was also denied.

The defendants waived their right to a jury trial. They presented no evidence at their separate bench trials, and the district court found each defendant guilty of all charges.

A probation officer prepared presentence reports recommending, among other things, that each defendant's offense level be increased by five levels because the defendants had engaged in a pattern of activity involving sexual abuse of a minor. See U.S.S.G. §

2G2.2(b)(4)(2003). The probation officer also recommended that neither defendant receive an offense-level reduction for acceptance of responsibility. Mr. and Mrs. Adkins objected to these recommendations.

In Mr. Adkins' case the government moved for an upward departure from the guideline sentence range, a range that the probation officer had put at 292-365 months. The government argued that the five-level enhancement recommended by the probation officer did not adequately reflect the seriousness of the sexual abuse in which Mr. Adkins had engaged. The government requested an additional two-level increase in Mr. Adkins' offense level, which would result in a sentence range of 360 months to life.

The district court overruled the defendants' objections to the presentence reports and granted the government's motion for an upward departure in Mr. Adkins' case. Mr. Adkins was sentenced to 900 months, and Mrs. Adkins received a sentence at the top of her guideline range, 365 months.

Each defendant filed a timely notice of appeal.

II

In reviewing the denial of a motion to suppress, this court defers to the district court's factual findings unless they are clearly erroneous; the district court's legal conclusions are reviewed de novo. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.) (en banc), *cert. denied*, 125 S.Ct. 261 (2004). "Where the district court has denied the motion to suppress,

'the appellate court must consider the evidence in the light most favorable to the government.'" *United States v. Herndon*, 393 F.3d 665, 667 (6th Cir.) (quoting *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc)), *vacated on other grounds*, 125 S.Ct. 2279 (2005).

A

Mr. Adkins argues that the evidence seized pursuant to the search warrants, as well as the statements he made at the time of the search, should have been suppressed because Agent Vito's affidavit did not establish probable cause. Adkins contends that the opinions expressed in the affidavit should not have been considered in the probable-cause analysis, and he maintains that the affidavit is insufficient even if the opinions are taken into account.

1

Mr. Adkins' first argument is based on *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), where the Supreme Court held that an evidentiary hearing is required if a defendant makes a substantial showing that false statements necessary to a finding of probable cause were intentionally, knowingly, or recklessly included in an affidavit supporting an application for a search warrant. If, at the hearing, the defendant proves the statements false by a preponderance of the evidence, then the challenged portion of the affidavit must be set aside and the search warrant voided. *Franks*, 438 U.S. at 156.

We are not persuaded that the opinions in question here constitute recklessly false statements.  Mr. Adkins contends that Agent Vito's opinion[1] that Adkins is a preferential offender is not supported by anything within the four corners of the affidavit.  But the affidavit set forth reasons to believe that Adkins had committed four recent child molestations, two at libraries and two at playgrounds; that he kept children's toys in his car; that he spent "a great deal of time" on his computer; that he had sexually molested children under his wife's care; and that he and his wife had discussed kidnaping a child for sexual purposes.  This evidence suggests that Adkins exhibited many of the characteristics of preferential child sex offenders described in Agento Vito's affidavit: he is sexually attracted to children; his sexual behavior toward children is repetitive and predatory; he devoted time, money, and energy toward sexual contact with children (and perhaps child pornography via the internet); and he possessed toys, which can be considered "child erotica."

It is true that the affidavit did not set forth evidence that Mr. Adkins possesses every characteristic of a preferential child sex offender.  There was no evidence, for example, that Adkins had a well-developed process for "grooming" future victims.  But the evidence that was contained in the affidavit — most tellingly, the evidence that Adkins had sexually molested children on multiple occasions over a period of years — was sufficient, in our view,

---

[1]Mr. Adkins asserts that the opinions expressed in the affidavit are Agent Clemente's rather than Agent Vito's.  The text of the affidavit does not support that assertion.

to support Agent Vito's opinion that Adkins is a preferential offender.  The opinion cannot be regarded as "false" for purposes of a *Franks* analysis.

The affidavit of Susan Smith, Ph.D., does not persuade us otherwise.  Dr. Smith stated that "child molester typologies are purely theoretical" and that "profiling" of offenders is not a scientifically validated process.  She stated further that "[i]t is not possible to accurately classify a sexual offender as a preferential offender without talking to the man . . . ."  In Dr. Smith's opinion, Agent Vito's affidavit does not contain "enough information to accurately classify Mr. Adkins as any particular type of sexual offender with any kind of precision." None of this, however, suggests that Agent Vito formed his opinion with reckless disregard for the truth.  Agent Vito received information from Agent Clemente as to the characteristics of a typical preferential child sex offender, he found evidence that Mr. Adkins exhibited several of those characteristics, and he concluded that Adkins is a preferential offender. Agent Vito had no reason, as far as we know, to doubt the reliability of the information he received from Clemente.  Agent Vito's conclusion was not presented as a matter of scientific certainty, moreover, nor was it required to be.  Regardless of whether the conclusion was correct, we see nothing reckless about the affidavit.

2

We are satisfied that Agent Vito's affidavit — including the opinions he based on the input of Agent Clemente — established probable cause to search Mr. Adkins' house and car.

Standing alone, a high incidence of child molestation by persons convicted of child pornography crimes may not demonstrate that a child molester is likely to possess child pornography. But the affidavit set forth other information on the likelihood of a molestor's possessing pornography, namely the FBI's "institutional knowledge," as communicated by Agent Clemente. This "institutional knowledge" included the information that preferential offenders devote time, money, and energy to the pursuit of child pornography or sexual contact with children; that they typically keep collections of child pornography or "child erotica"; and that they have well-developed techniques for gaining access to child pornography or child victims. This information, in conjunction with Agent Vito's determination that Mr. Adkins is a preferential offender, supports a finding that Adkins was reasonably likely to possess child pornography.

Mr. Adkins' only argument with respect to suppression of his statements to the police is that they were the fruits of an illegal search. Because the search warrant was supported by probable cause, as we have determined, Adkins' statements were admissible along with the physical evidence found in the search.

B

Mrs. Adkins argues that her statements to the police should have been suppressed on the ground that she was not given her *Miranda* warnings until the conclusion of her interview and on the ground that her statements were not voluntary.

1

The warnings described in *Miranda v. Arizona*, 384 U.S. 436 (1966), are required only when a suspect is in police custody. See *United States v. Bowden*, 380 F.3d 266, 271 (6th Cir. 2004), *vacated on other grounds*, 125 S.Ct. 1615 (2005). "In determining whether a suspect is in custody, the court must look to the totality of circumstances surrounding the interrogation to determine whether the suspect was either formally placed under arrest or was restrained in movement in a manner similar to a formal arrest." *Id.* at 272. Whether a defendant was in custody is a mixed question of law and fact, subject to de novo review. See *id.* at 271 n.3.

Mrs. Adkins says that she was restrained during her interview, and was thus in police custody, inasmuch as she was wearing pajamas, she was not permitted to enter her house to change clothes, and she had no means of transportation. But the district court believed the officer's testimony that Mrs. Adkins was wearing street clothes, that she was told she was not under arrest, and that the officers offered to drive her home whenever she wished. Mrs. Adkins has not shown (nor has she suggested) that she was in custody under the officer's version of the facts, and she has not shown that the court erred in finding the officer's testimony credible.

2

"[C]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). To determine whether police tactics were coercive, "this court looks to the totality of the circumstances concerning whether [the] defendant's will was overborne . . . ." *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999) (internal quotation marks omitted). The district court's conclusion that Mrs. Adkins' statements were voluntary is reviewed de novo. See *id.* at 422.

Mrs. Adkins relies on the following facts to show that her statements were not voluntary: the interview lasted approximately eight and a half hours; she had been awake for 36 hours before the interview began; much of the interview was conducted at a police station; she has low intelligence; she was not given *Miranda* warnings until the end of the interview; and police falsely told her that Mr. Adkins had told them what they wanted to know.

We are not persuaded that Mrs. Adkins' will was overborne. If, as the officer credibly testified, Mrs. Adkins was told she could terminate her interview at any time, then the length of the interview and Mrs. Adkins' lack of sleep were not coercive. The continuation of the interview at a police station was not coercive, given that Mrs. Adkins was free to leave. The district court found, after observing Mrs. Adkins' testimony, that her low intelligence "did not impede her ability to voluntarily answer questions put to her" by the police. We have no basis on which to second-guess this finding. Finally, the psychological tactic of telling Mrs. Adkins that Mr. Adkins had already confessed does not strike us as coercive. *Cf. Mahan*,

190 F.3d at 422 ("Not all psychological tactics are unconstitutional.") (internal quotation marks omitted).

## III

Both defendants argue that the district court erred in enhancing their offense levels under U.S.S.G. § 2G2.2(b)(4), which provides for a five-level increase "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." "Pattern of activity involving the sexual abuse or exploitation of a minor" is defined as

> "any combination of two or more separate instances of the sexual abuse or
> sexual exploitation of a minor by the defendant, whether or not the abuse or
> exploitation (A) occurred during the course of the offense; (B) involved the
> same or different victims; or (C) resulted in a conviction for such conduct."
> U.S.S.G. § 2G2.2, comment. (n.1) (2003).

Mr. and Mrs. Adkins contend that the evidence did not support the application of this enhancement.

We disagree.  Mrs. Adkins admitted to the police that both she and Mr. Adkins had abused children on multiple occasions over a period of years.  The defendants, pointing out that Mrs. Adkins' statements were not entirely consistent with the reports of certain victims and witnesses, question the reliability of the statements.  There was reason to believe, however, that the statements were consistent in important respects and that a police investigation had corroborated portions of them.  Moreover, the statements were voluntary,

as we have concluded, and were plainly against Mrs. Adkins' interest. It seems to us, therefore, that the statements were sufficiently reliable.

The district court's upward departure from Mr. Adkins' guideline sentence range is likewise supported by Mrs. Adkins' statements. The commentary to § 2G2.2 states that "an upward departure may be warranted if the defendant received an enhancement under subsection (b)(4) but that enhancement does not adequately reflect the seriousness of the sexual abuse or exploitation involved." U.S.S.G. § 2G2.2, comment. (n.2) (2003). The district court concluded that an upward departure was warranted because Mr. Adkins

> "has a long history of abuse of minors. The number of victims significantly exceeds that required [for the five-level enhancement under § 2G2.2(b)(4)]. The defendant preyed upon particularly vulnerable victims. In some instances, the victims were in the care and custody of the defendant, who occupied a position of trust, and he preyed upon children in playgrounds and public libraries where they should be able to feel safe from victimization."

These findings are supported by the evidence.

The defendants contend that the district court should have applied the "reasonable doubt" standard when deciding whether the evidence warranted the sentence enhancement (and, in Mr. Adkins' case, the upward departure). It is apparent from the record, however, that the court made the necessary findings beyond a reasonable doubt.

IV

Mrs. Adkins argues that she should have received a two-level reduction in her offense level because she clearly demonstrated acceptance of responsibility for her crimes. See U.S.S.G. § 3E1.1(a) (2003). "The district court's determination regarding acceptance of responsibility must be sustained unless clearly erroneous." *United States v. Angel*, 355 F.3d 462, 476 (6th Cir.), *cert. denied*, 125 S.Ct. 211 (2004).

In determining whether a defendant qualifies for a sentence reduction under § 3E1.1(a), a court should consider whether the defendant has truthfully admitted the offense conduct and truthfully admitted, or not falsely denied, any additional relevant conduct. See U.S.S.G. § 3E1.1(a), comment. (n.1) (2003). The reduction is not normally available to a defendant who "puts the government to its burden of proof at trial by denying the essential factual elements of guilt . . . ." *Id.*, comment. (n.2). "In rare situations," however, a defendant may clearly demonstrate acceptance of responsibility "even though he exercises his constitutional right to a trial," such as when the defendant goes to trial solely to preserve issues unrelated to factual guilt. *Id.*

Mrs. Adkins' claim that she clearly demonstrated acceptance of responsibility is based on her admission that she and Mr. Adkins downloaded child pornography to their home computer. But after admitting that she and her husband had also committed multiple child molestations, Mrs. Adkins denied the truth of the latter admissions. A false denial of relevant

conduct is inconsistent with acceptance of responsibility. See U.S.S.G. § 3E1.1, comment. (n.1) (2003).

Mrs. Adkins insists that she went to trial solely to preserve her suppression issues. That may be, but the district court's finding as to acceptance of responsibility was not based primarily on the fact of the trial. The court focused on Mrs. Adkins' retraction of her inculpatory statements and the court's perception that she had not shown remorse. Like a denial of relevant conduct, "[l]ack of true remorse is a valid consideration under § 3E1.1." *United States v. Castillo-Garcia*, 205 F.3d 887, 889 (6th Cir. 2000). The district court did not clearly err in refusing to reduce Mrs. Adkins' sentence.

V

Both defendants argue that re-sentencing is required under *United States v. Booker*, 125 S. Ct. 738 (2005). There was no violation of *Booker*'s Sixth Amendment holding — that any fact necessary to support a sentence be admitted by the defendant or proved to a jury beyond a reasonable doubt — because the defendants waived their right to a jury trial. But the district court clearly erred by treating the sentencing guidelines as mandatory. See *Booker*, 125 S. Ct. at 764, 769. We must remand the case for re-sentencing, therefore, if "the district court might have exercised its discretion to impose a lower sentence had it known that the Guidelines were advisory." *United States v. Barnett*, 398 F.3d 516, 526-30 (6th Cir.), *cert. denied*, __ S.Ct. __ (2005).

In Mr. Adkins' case the district court granted the government's motion for a two-level upward departure, thereby raising the guideline sentence range to 360 months to life. The court did not impose a life sentence, however, choosing instead a sentence that gives Adkins some chance — however remote — of being released in his old age. The court also expressed "compassion" for Mr. Adkins. In these circumstances we cannot exclude the possibility that the court would have chosen a more lenient sentence had it not been operating within a guideline system it regarded as mandatory.

In Mrs. Adkins' case, the district court imposed a sentence at the very top of the guideline range. The court stated that "it must impose a sentence at the high end of the guideline range to meet the objectives . . . set out in [18 U.S.C. § 3553]." This strongly suggests that the court would not have sentenced Mrs. Adkins more leniently had it understood the guidelines to be advisory. See *United States v. Webb*, 403 F.3d 373, 382-83 (6th Cir. 2005). At oral argument, however, the government maintained that the likelihood of prejudice in Mr. Adkins' case was no greater than the likelihood of prejudice in Mrs. Adkins' case. In the light of our conclusion that Mr. Adkins must be re-sentenced, we think the interests of fairness require that Mrs. Adkins be re-sentenced as well.

The defendants' convictions are **AFFIRMED**, their sentences are **VACATED**, and both cases are **REMANDED** for re-sentencing.